# NO. 19-2275-cv

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

NICHOLAS FRANZE, on behalf of themselves, and of all similarly
situated individuals, GEORGE SCHRUFER, JR., on behalf
of themselves, and of all similarly situated individuals,

*Plaintiffs-Counter-Defendants-Appellants,*

*v.*

BIMBO BAKERIES USA, INC., BIMBO FOODS BAKERIES DISTRIBUTION, LLC,
FKA BIMBO FOODS BAKERIES DISTRIBUTION INC.,
FKA GEORGE WESTON BAKERIES DISTRIBUTION, INC.,

*Defendants-Counter-Claimants-Appellees,*
*and*

BIMBO FOODS BAKERIES DISTRIBUTION, INC.,
FKA GEORGE WESTON BAKERIES DISTRIBUTION, INC.,

*Defendants*

*On Appeal from the United States District Court*
*for the Southern District of New York*

**BRIEF *AMICUS CURIAE* by
THE LABOR AND EMPLOYMENT COMMITTEE OF THE NATIONAL
LAWYERS GUILD, THE NATIONAL LAWYERS GUILD-NEW YORK
CITY CHAPTER'S LABOR AND EMPLOYMENT COMMITTEE, THE
MAURICE & JANE SUGAR LAW CENTER FOR ECONOMIC & SOCIAL
JUSTICE, AND THE NATIONAL EMPLOYMENT LAWYERS
ASSOCIATION/NEW YORK.
In Support of Reversal**

Shannon Liss-Riordan
Harold Lichten, *request for admission pending*
Lichten & Liss-Riordan, P.C.          *Attorneys for Amici Curiae*
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800

**CERTIFICATE OF INTERESTED PERSONS, CORPORATE DISCLSORUE STATEMENT AND STATEMENT PURSUANT TO FRAP 29(A)(4)**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4), *amici curiae*

hereby provide the following disclosure statements:

The **Labor and Employment Committee of the National Lawyers Guild** is a

non-profit corporation that offers no stock; there is no parent corporation or

publicly owned corporation that owns 10 percent or more of this entity's stock.

The **National Lawyers Guild – New York City Chapter's Labor and**

**Employment Committee** is a non-profit corporation that offers no stock; there is

no parent corporation or publicly owned corporation that owns 10 percent or more

of this entity's stock.

The **Maurice & Jane Sugar Law Center for Economic & Social Justice** is a

non-profit corporation that offers no stock; there is no parent corporation or

publicly owned corporation that owns 10 percent or more of this entity's stock.

The **National Employment Lawyers Association/New York** is a non-profit

corporation that offers no stock; there is no parent corporation or publicly owned

corporation that owns 10 percent or more of this entity's stock.

# TABLE OF CONTENTS

I.    The Misclassification of Employees by Forcing Delivery Drivers to Buy their Routes is Part of a Troubling Trend which Imposes Significant Societal Costs. ...................................................................................................................4

II.   Statement of Facts..............................................................................................8

III.  Applicable Law.................................................................................................12

    A. The FLSA ....................................................................................................12

    B. New York Labor Law..................................................................................14

    C. Both Tests are Highly Fact Specific, Making Summary Judgment Inappropriate. ....................................................................................................17

IV.   The District Court Misapplied Several FLSA Factors and Engaged in Impermissible Fact-Finding...............................................................................18

    A. Bimbo Exerted Significant Control Over Plaintiffs....................................18

    B. Plaintiffs' Opportunity for Profit and Loss and Investment in their Business. ...............................................................................................................23

    C. Plaintiffs Did Not Need Specialized Skill or Initiative to Perform Their Work. ....................................................................................................................26

    D. Bimbo and Plaintiffs' Working Relationship was Long-Term and Permanent. ............................................................................................................26

    E. Plaintiffs are an Integral Part of Bimbo's Business. ...................................28

V.    Saleem is Distinguishable..................................................................................29

VI.   CONCLUSION..................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

Agerbrink v. Model Service LLC,
   787 Fed. Appx. 22 (2d. Cir. 2019) ..................................................................18

Baker v. Flint Engineering & Const. Co.,
   137 F.3d 1436 (10th Cir. 1998)......................................................................25

Brock v. Superior Care,
   840 F.2d 1054, 1058 (2d Cir. 1988)......................................................... passim

Bynog v. Cipriani Group, Inc.,
   (Court of Appeals New York, Dec. 02, 2003) 1 N.Y.3d 193........... 15, 16, 17, 28

Claim of McKenna,
   233 A.D.2d 704 (N.Y. App. Div. 1996)...........................................................17

Craig v. FedEx Ground Package Sys., Inc.,
   300 Kan. 788 (2014).......................................................................................7

Department of Labor and Industries of State v. Lyons Enterprises Inc.,
   185 Wash 2d 721 (Wash. 2016) .....................................................................20

Dole v. Snell,
   875 F.2d 802 (10th Cir. 1989)........................................................................25

Employees as Price-Takers,
   Naomi B. Sunshine, 22 LEWIS AND CLARK LAW REVIEW 105 (2018) ..................8

Estrada v. FedEx Ground,
   2004 WL 5631425 (Cal. Super. Ct. July 26, 2004)...........................................14

Fernandez v. Kinray, Inc.,
   406 F. Supp. 3d 256 (E.D.N.Y. 2018).................................................. 13, 19, 20

Franze v. Bimbo Foods Bakeries Distribution, LLC,
   2019 WL 2866168 (S.D.N.Y. July 2, 2019) ............................................. passim

Garcia v. Pasquareto,
   11 Misc. 3d 1, 2 (App. Term 2004)..................................................................14

Greene v. Osterhoudt,
   251 A.D.2d 786 (N.Y. App. Div. 1998)............................................................18

Hart v. Rick's Cabaret Intern, Inc.,
   967 F. Supp. 2d 901 (S.D.N.Y. 2013) ...................................................... 15, 16, 17

Hurst v. Buczek Enterprises, LLC,
   2012 WL 1564733, (N.D. Cal. May 2, 2012) ........................................................23

Keller v. Miri Microsystems LLC,
   781 F.3d 799 (6th Cir. 2015) ................................................................................28

Matter of Claim of Cowan,
   159 A.D. 3d 1312 (N.Y. App. Div. 2018) .............................................................17

Matter of Oakes,
   137 A.D. 2d. 927 (N.Y. App. Div. 1988) ..............................................................17

Matter of Pepsi Cola Buffalo Bottling Corp.,
   144 A.D. 2d 220 (N.Y. App. Div. 1988) ...............................................................17

Matter of Ted Is Back Corp.,
   64 N.Y.2d (N.Y. 1984) .........................................................................................17

Molina v. S. Florida Exp. BankServ, Inc.,
   420 F. Supp. 2d 1276 (M.D. Fla. 2006) ................................................................23

Rainbow Development, LLC v. Com., Dept. of Industrial Accidents,
   2005 WL 3543770 (Mass. Super. Ct. Nov. 17, 2005).........................................29

Saleem v. Corporate Transportation Group, Ltd.,
   854 F.3d 131 (2d. Cir. 2017) ........................................................................ passim

Scantland v. Jeffry Knight, Inc.,
   721 F.3d 1308 (11th Cir. 2013) ........................................................... 13, 23, 27

**Statutes**

The Fair Play Act,
   NYLL § 862...........................................................................................................15

**Other Authorities**

(In)Dependent Contractor Misclassification,
   FRANÇOISE CARRÉ, ECONOMIC POLICY INSTITUTE (June 8, 2015),
   https://www.epi.org/publication/independent-contractor-misclassification/ .........6

Annual Report of Joint Enforcement Task Force on Employee Misclassification,
   NEW YORK DEPARTMENT OF LABOR (Feb. 1, 2015) at 3,

https://www.labor.ny.gov/agencyinfo/PDFs/Misclassification-Task-Force-Report-2-1-2015.pdf. ...........................................................................6

Bimbo Bakeries "About Us",
    available at https://www.bimbobakeriesusa.com/about-us#fact-sheet (accessed Jan. 15, 2020).........................................................................................25

From Hierarchies to Markets: FedEx Drivers and the Work Contract as
    Institutional Marker,
    *Julia Tomassetti,* 19 LEWIS AND CLARK LAW REVIEW 1083 (2015) .....................7

How to Make Employment Fair in an Age of Contracting and Temp Work,
    HARVARD BUSINESS REVIEW (Mar. 24, 2017), https://hbr.org/2017/03/making-employment-a-fair-deal-in-the-age-of-contracting-subcontracting-and-temp-work ...........................................................................................................6

Independent Contractor Misclassification Imposes Huge Costs on Workers and
    Federal and State Treasuries,
    NATIONAL EMPLOYMENT LAW PROJECT (September 2017),
    https://www.nelp.org/publication/independent-contractor-misclassification-imposes-huge-costs-on-workers-and-federal-and-state-treasuries-update-2017/ ..5

Investors Presentation 3Q19
    BIMBO BAKERIES (Third Quarter 2019), available at
    https://grupobimbo.com/en/investors .................................................................29

Overview of Paid Sick Time Laws in the United States,
    A BETTER BALANCE (June 5, 2019), https://www.abetterbalance.org/paid-sick-time-laws/?export ...........................................................................................9

The Deadly Race: How Amazon Hooked America on Fast Delivery While
    Avoiding Responsibility for Crashes,
    Patricia Callahan, PROPUBLICA (Sept. 5, 2019),
    https://features.propublica.org/amazon-delivery-crashes/how-amazon-hooked-america-on-fast-delivery-while-avoiding-responsibility-for-crashes/ ...................7

Who's the Boss: Restoring Accountability for Labor Standards in Outsourced
    Work,
    NATIONAL EMPLOYMENT LAW PROJECT (May 2014), https://www.nelp.org/wp-content/uploads/2015/02/Whos-the-Boss-Restoring-Accountability-Labor-Standards-Outsourced-Work-Report.pdf ..............................................................5

<u>**INTEREST OF** *AMICI CURIAE*[1]</u>

The **Labor and Employment Committee ("LEC") of the National Lawyers Guild ("NLG")** is a non-profit unincorporated legal association engaged in legal education and advocacy. The membership of the LEC includes approximately 6,000 lawyers, law students, legal workers, and worker representatives. It serves as a liaison between the NLG and legal organizations that represent organized labor and workers. The NLG was founded in 1937 as the first integrated national organization of lawyers in the United States. Labor and employment issues have been a central focus of the Guild's mission during its history. The LEC has a long record of action on behalf of low-wage and immigrant workers, both as amicus and through strategic coordination, scholarship and advocacy. The members of LEC also provide direct representation to workers, including those facing misclassification by their employers.

The **National Lawyers Guild New York City Chapter's Labor and Employment Committee ("NLG-NYC LEC")** is a committee of the New York

---

[1]     Pursuant to Local Rule 29.1(b) and Federal Rule of Appellate Procedure 29(a)(4)(E), neither party's counsel authored any part of this brief; nor has any party, its counsel, or any other person contributed money intended to fund preparing or submitting the brief.

Attorney for *amici* Harold Lichten represents several other Bimbo drivers pursuing wage claims under the New York Labor Law and Fair Labor Standards Act in other pending proceedings.

City Chapter of the NLG, consisting of labor-and-employment lawyers, law students, and legal workers. The NLG-NYC LEC provides professional development programs, support work, and mentoring to its members and constituents. The NLG-NYC LEC's members represent labor unions, workers' centers, community organizations, and individual workers throughout New York State and the rest of the nation in all areas of workers' rights. The proper classification of workers as employees is a central concern of the NLG-NYC LEC, because most workplace rights hinge on whether workers are employees.

The **Maurice & Jane Sugar Law Center for Economic & Social Justice** ("Sugar Law Center") is a leading national nonprofit law center based in Detroit, Michigan. The Sugar Law Center provides legal support to workers and labor organizations across the United States, including in New York State. The Sugar Law Center provides legal services on projects that seek to ensure a workplace free of discrimination, protect workers from wage theft, improve benefits to displaced workers, ensure the right to organize, and realize fuller economic and social rights. Among the populations the Sugar Law Center serves are misclassified workers.

The **National Employment Lawyers Association/New York** (NELA/NY) is the local affiliate of the National Employment Lawyers Association (NELA). It promotes the rights of employees through legislation, a legal referral service, and other activities, with an emphasis on the challenges presented by New York's

employment laws.  NELA is the country's only professional organization comprised exclusively of lawyers who represent individual employees in cases involving employment discrimination, wrongful termination, employee benefits, and other employment-related matters. NELA has a membership of more than 2,000 lawyers in 50 states and the District of Columbia, as well as 50 state and local affiliates around the country.  NELA strives to protect the rights of its members' clients, and regularly supports precedent-setting litigation affecting workplace rights, including to ensure proper classification of workers.

I. **The Misclassification of Employees by Forcing Delivery Drivers to Buy their Routes is Part of a Troubling Trend which Imposes Significant Societal Costs.**

The misclassification of employees as independent contractors is a significant problem in today's economy. Misclassification is part of the broader trend of employers adopting workplace structures that reduce their accountability and erode workers' legal protections.[2] Misclassification denies workers the protection of workplace laws; robs unemployment insurance and workers' compensation funds of billions of dollars; and reduces federal, state, and local tax withholding and revenues.[3] Absent rigorous enforcement of labor standards meant to protect workers, the incentive for employers to misclassify their employees is clear: they can save thirty percent on their payroll and related tax expenses. Id.

---

[2] See Catherine Ruckelshaus, et al., Who's the Boss: Restoring Accountability for Labor Standards in Outsourced Work, NATIONAL EMPLOYMENT LAW PROJECT (May 2014), https://www.nelp.org/wp-content/uploads/2015/02/Whos-the-Boss-Restoring-Accountability-Labor-Standards-Outsourced-Work-Report.pdf (identifying misclassification as a type of outsourcing structure by which employers avoid accountability for workplace laws).

[3] Catherine Ruckelshaus and Celidh Gao, Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries, NATIONAL EMPLOYMENT LAW PROJECT (September 2017), https://www.nelp.org/publication/independent-contractor-misclassification-imposes-huge-costs-on-workers-and-federal-and-state-treasuries-update-2017/

The results include depressed wages and harm to businesses that cannot compete with employers who lower their labor costs through illegal misclassification.[4]

The trend of misclassification is pervasive and imposes significant costs on both workers and society as a whole. Studies show that between ten and twenty percent of employers misclassify at least one worker.[5] Between 1996 and 2004, $34.7 billion of federal tax revenues went uncollected due to misclassification.[6] Here in New York, the Task Force on Employee Misclassification identified almost 140,000 instances of misclassification and $2.1 billion in unreported wages between 2007 and 2015.[7] By engaging in misclassification and similar schemes, employers avoid liability for accidents that occur in connection with the work done on their behalf. By misclassifying its delivery drivers as independent contractors,

---

[4]    David Weil, How to Make Employment Fair in an Age of Contracting and Temp Work, HARVARD BUSINESS REVIEW (Mar. 24, 2017), https://hbr.org/2017/03/making-employment-a-fair-deal-in-the-age-of-contracting-subcontracting-and-temp-work.

[5]    Françoise Carré, (In)Dependent Contractor Misclassification, ECONOMIC POLICY INSTITUTE (June 8, 2015), https://www.epi.org/publication/independent-contractor-misclassification/

[6]    156 Cong. Rec. S7135-01, S7136 (daily ed. Sept. 15, 2010)

[7]    Annual Report of Joint Enforcement Task Force on Employee Misclassification, NEW YORK DEPARTMENT OF LABOR (Feb. 1, 2015) at 3, https://www.labor.ny.gov/agencyinfo/PDFs/Misclassification-Task-Force-Report-2-1-2015.pdf.

Amazon avoids liability for all employment-law obligations and for the accidents that result in injuries and deaths in the course of delivering its products—all while controlling drivers' routes and setting delivery deadlines.[8]

Like Plaintiffs here, workers in the transportation industry are particularly vulnerable to misclassification.[9]  Companies like Bimbo and FedEx design their workers' contracts to facially resemble independent contracting agreements.[10] However, to take advantage of ambiguity in the legal tests to determine employment status, they mask their all-encompassing control over workers as compliance with bargained-for contracts, and their avoidance of employment-law obligations as entrepreneurial opportunities.  One author noted that FedEx framed drivers' delivery route assignments as a bargained-for "contractual agreement to

---

[8]    Patricia Callahan, <u>The Deadly Race: How Amazon Hooked America on Fast Delivery While Avoiding Responsibility for Crashes</u>, PROPUBLICA (Sept. 5, 2019), <u>https://features.propublica.org/amazon-delivery-crashes/how-amazon-hooked-america-on-fast-delivery-while-avoiding-responsibility-for-crashes/</u>

[9]    Carré, *supra* note 5 (finding that workers in sectors with "scattered workplaces" and where service is performed in isolation are vulnerable to misclassification); Senate Introducer's Mem. in Supp., Bill Jacket, L. 2013, chap. 558 at 6 ("Misclassification rates are disproportionately high in the trucking industry.").

[10]    <u>See</u> <u>e.g.</u>, <u>Craig v. FedEx Ground Package Sys., Inc.</u>, 300 Kan. 788, 791 (2014) (FedEx admitted to "carefully structur[ing] its drivers' operating agreements so that it could label the drivers independent contractors to gain a competitive advantage…." The Supreme Court of Kansas still held that FedEx's drivers were employees.).

service a particular area."[11]  In reality, FedEx exercised such extensive control over their drivers' work that "bargaining over delivery areas was not a meaningful source of entrepreneurial opportunity" because drivers could not "exploit what FedEx claims was their 'proprietary interest' in their delivery routes."[12]  Here, the District Court disregarded Bimbo's control because "Plaintiffs … could buy and sell portions of distribution rights from other IOs."  <u>Franze v. Bimbo Foods Bakeries Distribution, LLC</u>, 2019 WL 2866168 (S.D.N.Y. July 2, 2019) at *6–7. But regardless of the routes drivers supposedly purchase, Bimbo controls essential terms like the price of goods sold and delivered to Bimbo customers.[13]

---

[11]     Julia Tomassetti, <u>From Hierarchies to Markets: FedEx Drivers and the Work Contract as Institutional Marker</u>, 19 LEWIS AND CLARK LAW REVIEW 1083, 1112 (2015) (citing <i>In re FedEx Ground Package System Inc.</i>, 734 F. Supp. 2d 557, 589 (N.D. Indiana 2010), <i>rev'd.</i>, 792 F.3d 818 (7th Cir. 2015) (finding FedEx delivery drivers employees rather than independent contractors under Kansas law)).

[12]     <u>Id.</u> at 1111–12.

[13]     <u>See</u> <u>Franze</u>, 2019 WL 2866168 at *3 (Noting institutional customers dealt exclusively with Defendants as to service issues, price, and schedules.  Also noting Defendants acted as Plaintiffs' "agent" with respect to chain-store customers).

Several factors supposed to reflect independent contractor status benefit employers.  Companies avoiding employment-law liability can reap additional savings by shifting costs like investment in equipment to workers.  Indicia of control and economic dependence which impose some cost, like giving workers control over prices and the ability to work for competitors, are therefore a better gauge of the employment relationship than factors which "beg the question" of misclassification.  Is a driver providing their truck because they are in business for themselves, or has a company shifted that cost onto them without providing the autonomy characteristic of independent contractors?  Naomi B. Sunshine,

FedEx also characterized the ability of its drivers to hire other drivers as entrepreneurial opportunity, while in practice drivers typically "hired" replacements when they were ill or needed a day off.[14]  The District Court similarly rejected Plaintiffs' argument that Bimbo controlled their work schedule by negotiating delivery schedules with customers, reasoning that Plaintiffs "could hire others to make deliveries on their behalf."  Franze, 2019 WL 2866168 at *6. Bimbo thus avoids compliance with overtime and sick-leave laws while ensuring its drivers remain liable for serving the customers most profitable for Bimbo however Bimbo sees fit.[15]

## II.  Statement of Facts

Plaintiffs Nicholas Franze and George Schrufer worked full-time as drivers for Bimbo Bakeries. They delivered the baked goods that Bimbo manufactures and/or distributes from Bimbo's warehouses to Bimbo customers such as grocery-

---

Employees as Price-Takers, 22 LEWIS AND CLARK LAW REVIEW 105, 153–54 (2018).

[14]     Tomassetti, *supra* note 11, at 1130–31.

[15]     Bimbo is likely required to provide paid sick-time to employees under New York City's and New Jersey's sick-leave laws.  Overview of Paid Sick Time Laws in the United States, A BETTER BALANCE (June 5, 2019), https://www.abetterbalance.org/paid-sick-time-laws/?export

See also Dkt. 89-2 at 91 (Schrufer Deposition, noting when he was Bimbo's employee, he received three weeks of paid vacation time.).

store chains, institutions (such as schools and prisons), and other commercial customers such as Walmart or Target.

Though Bimbo maintains that drivers like Plaintiffs "run their own business," Bimbo exclusively deals with the vast majority of customers that buy and sell Bimbo's products. See Dkt. 88 at 11–12. Bimbo unilaterally determines the price that a delivery driver must "pay" Bimbo for the product to be delivered, Bimbo determines the types of products that will be delivered, and Bimbo unilaterally negotiates with chain store and institutional customers to set their product prices.[16] When an institutional customer like a corrections facility wants to change a product quantity in an order or reschedule a delivery, they deal with Bimbo. See Dkt. 89-34 at 11–15. Numerous, detailed breach letters and related correspondence show that customers email Bimbo directly when they are running low on product stock or to specify when they want deliveries made. See e.g. Dkt. 89-19 at 8–10 (emails from Stop and Shop to Bimbo.).

When customers have an issue with a delivery driver's performance, they contact Bimbo to fix the problem, and then Bimbo deals with the driver/contractor. One customer may complain that it is low on Thomas' Raisin Muffins; another

---

[16]     See Dkt at 89-12 at 9 (Distribution Agreement § 3.3 provides that drivers "buy" Bimbo's products "on terms and prices established by [Bimbo] from time to time."); Dkt. 89-12 at 9 (Distribution Agreement § 5.2 requires Bimbo to act as the drivers' agent in negotiations with chain-store customers over product price and other terms.).

requires delivery on Tuesdays and Fridays between 8am and 11am.  Dkt. 89-19 at

10, 13.  After receiving such complaints, Bimbo often performs its own

investigation by visiting customer stores and taking pictures of allegedly unstocked

shelves or improperly displayed items to record its drivers' performance.  See Dkt.

89-19 at 5–8.  The breach letters make clear that Bimbo proactively monitors

drivers' performance by inspecting customer stores.  A breach letter to Plaintiff

Schrufer from a Bimbo sales representative noted that "we observed" out of stock

and low stock conditions at a Dollar General store in his territory.  Id. at 12.  When

Bimbo believes that delivery drivers' services are not up to its standards, it orders

them to remedy the issue consistent with its directions, or risk termination.  E.g. id.

at 8.

Bimbo's drivers cannot buy, sell, or deliver its competitors' products, nor

can they deliver products outside of a narrow territory drawn by Bimbo, clearly

distinguishing them from independent businesses.  See Dkt. 89-12 at 7.  Plaintiff

Franze testified that Bimbo's noncompete provision prevented him from delivering

for Pepperidge Farm, Bimbo's competitor.  See Dkt. 89-1 at 11–12.  Plaintiff

Schrufer confirmed that he would have to sell his Bimbo route to work for

competitors like Pepperidge Farm.  See Dkt. 89-2 at 57.  Further, Bimbo requires

Plaintiffs to service unprofitable store locations if it is part of a chain profitable for

Bimbo.  Dkt. 89-12 at 7.  Plaintiff Schrufer testified that when a Bimbo chain-store

customer opened a location within his territory, Bimbo *made him* service it.  Dkt. 89-2 at 55–56.  That is no different than an employee taking orders from their employer.

Bimbo also says drivers are not employees because they can theoretically work whatever schedule they want, but this is not true.  By negotiating delivery schedules and enforcing requirements through "breach letters" threatening termination, Bimbo dictates its drivers' precise schedules.  For example, Bimbo issued a breach letter to Plaintiff Franze stating that his failure to deliver to a facility on specific days and times—that Bimbo negotiated with the customer—was a breach of his agreement *with Bimbo* which could result in termination.  Dkt. 89-19 at 13.  In correspondence with Stop and Shop, store representatives asked *Bimbo* to ensure the store was serviced five days per week.  Dkt. 89-19 at 4.  As discussed in greater detail below, it makes no difference that Bimbo sets its drivers' schedule in response to customer demand, nor that Plaintiffs can theoretically hire someone to cover their route. [17]

---

[17]     Bimbo also imposes vehicle operation standards on "independent" drivers like Plaintiffs.  These include requirements to report to the company "any vehicle accident" while at the scene; forbidding "unauthorized passengers" from drivers' vehicles; and requiring drivers shut off their engine, remove their keys, and set their parking brake when they are servicing customers and working in their truck. Dkt. 89-25 at 3, 15.

The reality is that Bimbo's driver-contractors are subject to Bimbo's omnipresent control and do not enjoy the "independence" characteristic of a legitimate business enterprise; their relationship simply does not reflect that drivers are "in business for themselves." Saleem v. Corporate Transportation Group, Ltd., 854 F.3d 131, 138 (2d. Cir. 2017). At the least, these facts regarding control are hotly contested—and not resolvable on a Rule 56 Motion.

## III.  Applicable Law

### A.  The FLSA

In light of the Fair Labor Standards Act's ("FLSA") remedial purpose, "courts are required to construe the FLSA liberally, including its definition of employer." Fernandez v. Kinray, Inc., 406 F. Supp. 3d 256, 261 (E.D.N.Y. 2018). The Second Circuit "has long recognized that [the] FLSA was written in the broadest possible terms" and has "consistently declined to impose limitations on the definition of employer that would run counter to the breadth of the statute." Id. (internal citations omitted). Factors to evaluate employment status include: the degree of control exercised by the employer, the workers' opportunity for profit or loss and investment in the business, the degree of skill and initiative required to perform the work, and the extent to which the work is an integral part of the employers' business. Brock v. Superior Care, 840 F.2d 1054, 1058–59 (2d Cir. 1988). The key question is "whether, as a matter of economic reality, the workers

depend upon someone else's business for the opportunity to render service or are in business for themselves." Id. (internal citations omitted). "The inquiry is not governed by the 'label' put on the relationship … or the contract controlling that relationship, but rather focuses on whether 'the work done … follows the usual path of an employee.'" Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1311 (11th Cir. 2013) (internal citations omitted).

As detailed below, the lower court misapplied several of these factors, disregarded significant evidence contradicting its conclusions, and improperly resolved factual disputes in a motion for summary judgment. However, at the most basic level of the FLSA inquiry, it is clear that a jury could easily determine that Plaintiffs were economically dependent on Bimbo. Addressing similar considerations under California law, a court remarked that "[i]f 'lightning' were to strike so that there would be no FedEx, there would in fact be nothing left for the [employees] to do and they suddenly would be totally bereft of business." Estrada v. FedEx Ground, 2004 WL 5631425 (Cal. Super. Ct. July 26, 2004). Without Bimbo, Plaintiffs would be left with no products to deliver, no customers to service, and no income from their supposedly independent businesses. The routes they purchased—which depend upon Bimbo's acquisition of "exclusive distribution rights", Dkt. 89-12 at 2—would be valueless. Without Bimbo, Plaintiffs would be looking for new employers, not new customers.

**B.     New York Labor Law**

Like its federal counterpart, the New York Labor Law (NYLL) is a remedial statute meant to protect employees.  See Garcia v. Pasquareto, 11 Misc. 3d 1, 2 (App. Term 2004).  Though not raised below, Plaintiffs' employment status under state law is governed by the Commercial Good Transportation Industry Fair Play Act.[18]  Still, Plaintiffs should be deemed employees under the NYLL standard, which focuses on the "degree of control exercised by the purported employer over the results produced or the means used to achieve the results."   Bynog v. Cipriani Group, Inc., 1 N.Y.3d 193, 198 (N.Y. 2003).  Under Bynog, factors relevant to assessing control include whether the worker: worked at their own convenience,

---

[18]     The Fair Play Act, NYLL § 862, et seq., went into effect in 2014.  It was passed specifically to stop the misclassification of truckers in New York.  See Senate Introducer's Mem. In Supp. l., Bill Jacket, L. 2014 chap. 558 at 7.  When signing the Fair Play Act into law, Governor Cuomo remarked that the law "establishe[d] a statutory test for determining whether individuals in the trucking industry are classified as employees or independent contractors."  Governor's Mem., Bill Jacket, L. 2013, chap. 558 at 3.

    Under the statute, commercial-goods delivery drivers like Plaintiffs are presumptively employees.  Employers bear the burden of showing that workers meet eleven factors to qualify as separate business entities or the ABC test's three prongs to qualify as independent contractors.  NYLL § 862-b.  Because additional findings of fact are not required to apply the test, the Court can consider the issue on appeal.  See Foster v. United States, 329 F.2d 717, 718 (2d Cir. 1964).  At least, the Fair Play Act's presumption of employment status indicates a legislative intent to define commercial drivers as employees, and counsels against granting summary judgment to reach the opposite conclusion.

was free to engage in other employment, received fringe benefits, was on the employer's payroll, and was on a fixed schedule.  Id. at 198 (internal citations omitted).  Despite acknowledging that the FLSA and NYLL tests are distinct, New York courts note that "there is general support for giving FLSA and New York Labor Law consistent interpretations."  Hart v. Rick's Cabaret Intern, Inc., 967 F. Supp. 2d 901, 923–24 (S.D.N.Y. 2013).  Indeed, "there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)."  Id. at 924.

 Several of the Bynog factors are not particularly useful to the misclassification inquiry.[19]  Scholars note that factors like whether the worker received fringe benefits or was on the employer's payroll "beg the question [of employment status] and are easily manipulated by employers."[20]  Accordingly, one court recognized that workers "did not receive benefits or W-2s because [the employer] treated them as independent contractors."  Hart, 967 F. Supp. 2d at 925.  Placing significance on those factors "would effectively allow an employer to

---

[19]    In part, this is because Bynog involved a joint-employer scenario.  Plaintiffs in that case were waiters asserting that they were employees of a restaurant group to which they were frequently assigned by their staffing agency.  Bynog, 1 N.Y.3d at 197.  That would be the equivalent of the Plaintiffs alleging they were the employees of a Bimbo customer.

[20]    Sunshine, supra note 13, at 118–19.

control … a worker's status simply by labeling her an independent contractor and denying her employee benefits." Id.

The District Court also overlooked that courts and administrative agencies have already found that delivery drivers who allegedly bought their routes—including Bimbo drivers—are employees under the NYLL. A New York appellate court affirmed findings by New York's Department of Labor and its Unemployment Insurance Appeal Board that Bimbo's drivers are employees under the NYLL in part because Bimbo "exercised sufficient supervision, direction, and control over claimant to establish an employer-employee relationship under common-law principles." Matter of Claim of Cowan, 159 A.D. 3d 1312, 1314–15 (N.Y. App. Div. 2018).[21] That conclusion is consistent with other appellate court decisions concluding delivery-driver route owners were employees for purposes of unemployment after considering the employers' control over their work. See Matter of Pepsi Cola Buffalo Bottling Corp., 144 A.D. 2d 220 (N.Y. App. Div. 1988); Matter of Oakes, 137 A.D. 2d. 927 (N.Y. App. Div. 1988); Claim of McKenna, 233 A.D.2d 704 (N.Y. App. Div. 1996). These decisions indicate that a

---

[21] The New York Court of Appeals approvingly cites to unemployment decisions when discussing the NYLL's "right to control" test. See e.g. Bynog, 1. N.Y.3d 193 (citing Matter of Ted Is Back Corp., 64 N.Y.2d (N.Y. 1984)). Additionally, courts in this circuit consider as persuasive authority the Department of Labor's administrative decisions that workers are employees under the NYLL. E.g. Hart, 967 F. Supp. 2d at 924 (S.D.N.Y. 2013).

reasonable jury could conclude Plaintiffs were employees, such that the District Court's grant of summary judgment was inappropriate.

### C. Both Tests are Highly Fact Specific, Making Summary Judgment Inappropriate.

This court has made clear that employment status under the FLSA is a mixed question of fact and law. "The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from the facts … is a question of law." Brock, 840 F.2d at 1059. New York state appellate courts have likewise noted that under the NYLL, determination of employment status "usually presents questions of fact sufficient to preclude summary judgment." Greene v. Osterhoudt, 251 A.D.2d 786, 787 (N.Y. App. Div. 1998). This court has found that a district court's grant of summary judgment was improper where it resolved several existing issues of fact. Agerbrink v. Model Service LLC, 787 Fed. Appx. 22 (2d. Cir. 2019) (summary judgment improper given genuine disputes of fact over control over work schedule, ability to negotiate pay rate, and ability to accept or decline work.).

Here, the District Court granted summary judgment even though it acknowledged that key factual issues—including the extent of Plaintiffs' ability to communicate and negotiate with their supposed customers—were in dispute. Franze, 2019 WL 2866168 at *4. The court also overlooked significant evidence in the record that contradicts its conclusions. It concluded that Defendants exerted

at most "minimal or incidental control." Id. at *7.  Yet the record shows that

Defendants controlled Plaintiffs' work schedules and potential earnings, monitored

drivers' performance by auditing customer stores to check on product stock levels,

and directed drivers' work in minute detail by issuing breach letters threatening

termination if they did not comply with Bimbo's instructions.[22]  That is precisely

the type of dispute over the "existence and degree" of a factor like Defendant's

control of Plaintiff's work properly resolved at trial.  Brock, 840 F.2d at 1059.

Thus, the court's grant of summary judgment should be reversed.

## IV. The District Court Misapplied Several FLSA Factors and Engaged in Impermissible Fact-Finding.

### A. Bimbo Exerted Significant Control Over Plaintiffs.

The degree of control exerted by an employer over its workers is the most

important factor under the FLSA's economic realities test and the NYLL's

"control" test.  Thomas v. TXX Services, Inc., 663 Fed. Appx. 663, 688-89 (2d

Cir. 2016); Bynog,1 N.Y.3d at 198.  Indeed, courts in this circuit have refused to

grant summary judgment where the only factor of the economic reality test in

dispute was the degree of control exerted by the employer. Fernandez, 406 F.

Supp. 3d at 263–64 (concluding the court "cannot properly assess the 'totality of

---

[22]    See e.g. Dkt. 89-19 at 12.

the circumstances'" where "[t]oo many facts related to the issue of control are disputed.").

The District Court began its "control" inquiry by concluding that Plaintiffs' contracts facially "favor independent contractor status." Franze, 2019 WL 2866168 at *6. But that ignores this Court's warning that "an employer's self-serving label of workers as independent contractors is not controlling." Saleem, 854 F.3d at 141. Here, the only business Plaintiffs delivered for was Bimbo. Indeed, Bimbo prohibited Plaintiffs from working for its competitors. Dkt. 89-12 at 7. This court found significant that the drivers in Saleem were "free to drive for competitors, for personal clients, or not at all without violating their franchise agreements…." Saleem, 854 F.3d at 141; see also Department of Labor and Industries of State v. Lyons Enterprises Inc., 185 Wash 2d 721, 724 (Wash. 2016) (finding franchisees' noncompete agreement "the antithesis of independence."). Further, noting that an employer treated as "taxed employees" workers who did the same work as those it treated as independent contractors, this court found that "an employer's admission that his workers are employees covered by the FLSA is highly probative." Brock, 840 F.2d at 1059. Bimbo employs delivery drivers doing the same work as Plaintiffs as employees. Dkt. 88 at 13. Indeed, Plaintiff Schrufer was classified as an employee until Bimbo's predecessor implemented this classification scheme. Dkt. 88 at 10.

The District Court also improperly resolved significant factual disputes over factors that courts in this Circuit find relevant to assessing employer control over transportation workers. These include drivers' ability to set their own schedules and the degree to which transportation companies monitor and discipline their drivers.[23] Here, Plaintiffs' ability to control their own schedules is clearly in dispute. Plaintiffs asserted that they had to arrive at Bimbo's warehouse to load products by a certain time so they could reach the stores within the service windows negotiated *by Bimbo* with its chain and institutional customers. <u>See</u> Dkt. 89-1 at 26–28. Franze testified that Bimbo required him to service stores a minimum number of times per week and expected drivers to maintain their market seven days per week. <u>Id.</u> at 5. The District Court concluded that this did not reflect Bimbo's control because Plaintiffs "could hire others to make deliveries on their behalf." <u>Franze</u>, 2019 WL 2866168 at *6. That ignores that drivers' practical ability to hire drivers is also disputed. Franze testified that it was often impossible to hire someone to cover his route because he could not afford to do so, Dkt. 89-1

---

[23]     <u>Fernandez</u>, 406 F. Supp. 3d at 262 (citing <u>Saleem</u>, 52 F. Supp. 3d at 537–39, *aff'd*, 854 F.3d 131 (2d. Cir. 2017)). The other factors include whether drivers have the ability to work for other companies and whether the company inspected the drivers' vehicles. As noted, Bimbo prohibits Plaintiffs from working for competitors. Franze also testified that he witnessed Bimbo employees try to open drivers' vehicles to check if they were locked as Bimbo required. Dkt. 89-1 at 37.

at 13, and because doing so would require him to provide time-consuming training. Id. at 28.[24]

The District Court also ignored substantial evidence that Bimbo exerted control by monitoring and disciplining its drivers. Schrufer testified that Bimbo employees would provide him specific instructions about when to service stores or tell him where to put in-store product displays. Dkt. 89-2 at 109–112. Even though chain stores are ostensibly Plaintiffs' customers, only Bimbo fielded complaints regarding late deliveries or other issues with Plaintiffs' performance. Bimbo would then issue "breach letters" to Plaintiffs, forcing them to remedy the issue or risk termination. See e.g., Dkt. 89-19 at 9–11. Franze testified that even if drivers disagree with a customer's characterization of a problem, Bimbo overrules them and makes drivers remedy the issue. Dkt. 89-1 at 43. These breach letters also indicate that Bimbo itself monitors Plaintiffs' performance, with one letter to Schrufer noting "we [Bimbo] observed out of stock and low stock conditions" at a Dollar General store in his sales area. Dkt. 89-19 at 12; see also Dkt. 89-1 at 93–94 and 102–103 (Franze testifying he had a confrontation with a *Bimbo* employee regarding placement of items within a Stop and Shop store). Nonetheless, the Court concluded that Bimbo exerted at most "minimal or incidental control." Id. at

---

[24] See *supra* notes 13, 15. Plaintiffs must hire others to cover their routes *because* they are misclassified and expected to cover their routes seven days per week.

*7.  This is the type of factual dispute over the "existence and degree" of a FLSA factor properly resolved at trial.  Brock, 840 F.2d at 1059.

Despite Bimbo's negotiation and enforcement of the terms Plaintiffs had to follow when servicing chain and institutional customers, the District Court found that it was "the clients [that] exerted the most control over Plaintiffs," while "Defendants were more akin to intermediaries…."  Franze, 2019 WL 2866168 at *7.  Courts have rejected the argument that control exerted by employers at the behest of customers is irrelevant to determining employee status.  A Florida District Court recognized that "[a]ny employer's business is in essence directed by the needs of its customers." Molina v. S. Florida Exp. BankServ, Inc., 420 F. Supp. 2d 1276, 1284, n. 24 (M.D. Fla. 2006); see also Hurst v. Buczek Enterprises, LLC, 2012 WL 1564733, *14 (N.D. Cal. May 2, 2012) (rejecting same argument because if accepted it "would indicate that any worker who completes tasks … geared toward implementing client requests would become a contractor rather than an employee.").  Faced with a similar argument, the Eleventh Circuit noted that the "inquiry requires us to examine the nature and degree of the alleged control, not *why* the alleged employer exercised such control.  Business needs cannot immunize employers from [statutory] requirements. If the nature of a business requires a company to exert control over workers … then that company must hire employees, not independent contractors."  Scantland, 721 F.3d at 1316.

### B. Plaintiffs' Opportunity for Profit and Loss and Investment in their Business.

The District Court also ignored substantial evidence that Bimbo's control diminished Plaintiffs' opportunity for profit or loss. Bimbo exclusively handled all negotiations with chain and institutional customers over essential terms like product price, quantity, placement, shelf space, and schedule of service. See Dkt. 88 at 11–12. By negotiating and enforcing those terms, Bimbo controlled Plaintiffs' earnings for stores that comprised eighty-eight percent of Plaintiffs' net sales and eighty-two percent of their net revenue. Dkt. 88 at 12. Schrufer testified that Bimbo might negotiate to have ten feet of product space in a store, informing him how much product he needed to fulfill Bimbo's requirement to "adequately and properly supply the outlets" on his route. Dkt. 89-2 at 37–38. Because Bimbo *also* sets the price at which Plaintiffs purchase and sell those products, Bimbo controls Plaintiffs' earnings on these accounts.

The District Court dismissed such concerns because "[p]laintiffs could have grown their sales with smaller customers…." Franze, 2019 WL 2866168 at *7. Yet "pursuant to the economic reality test, it is not what Plaintiffs *could* have done that counts, but as a matter of reality what they actually *do* that is dispositive." Saleem, 854 F.3d at 142 (internal citations omitted) (emphasis in original). The reality is that Bimbo exercised significant control over virtually all of Plaintiffs' work. The court also ignored evidence that Bimbo's control affected Plaintiffs'

ability to sell to non-chain customers. Franze testified that Bimbo did not provide him certain single-serve products which are the "main sellers at small cash shops" for about one year. Dkt. 89-1 at 41. Schrufer testified that Bimbo took eighty percent of the sales revenue from non-Chain stores. Dkt. 89-2 at 42. That resembles an employee-salesperson receiving a commission, rather than an independent contracting relationship.[25]

The District Court also emphasized that Plaintiffs made "substantial investments" in their business by purchasing distribution agreements and equipment. Franze, 2019 WL 2866168 at *6. But numerous courts have recognized that "the fact that a worker supplies [their] own tools or equipment does not preclude a finding of employee status." Dole v. Snell, 875 F.2d 802, 810 (10th Cir. 1989) (collecting cases). The appropriate inquiry is the relative investment of the workers compared with that of the employer in the "overall operation." Baker v. Flint Engineering & Const. Co., 137 F.3d 1436, 1442 (10th Cir. 1998). The Tenth Circuit held that even though welders made "significant" investment in their welding rigs, their "investments are disproportionately small when compared to [the employer's] investment in the overall business." Id. Even a cursory review of

---

[25]     Compare Saleem, 854 F.3d 131, 138 (2d. Cir. 2017) (While Defendant negotiated rates with clients, "Plaintiffs took home the majority—in same cases up to 85%—of each CTG fare, less some small additional fees.").

Bimbo's website indicates that Bimbo makes a disproportionately large investment compared to Plaintiffs.[26]  Bimbo is a nationwide company serving all fifty states, employing more than twenty-thousand workers.[27]  Plaintiffs' own distribution agreements depend on Bimbo's substantial investment "develop[ing] and acquir[ing] the exclusive distribution rights to distribute and sell various fresh baked products throughout much of the United States."  Dkt. 89-12 at 3.  At the least, a comparison of Plaintiffs' and Defendants' investments is a question of fact inappropriate to resolve on a motion for summary judgment.

This court's analysis in <u>Saleem</u> is not to the contrary; indeed, it supports Plaintiffs here.  It noted that the drivers' investment in their franchises "created the platform for [their] black-car business that could be operated throughout the tri-state area, *wh*ether for Defendants or otherwise...." <u>Saleem</u>, 854 F.3d at 145–46. Unlike the <u>Saleem</u> drivers' investment, the Plaintiffs' investment did not create a business platform that could be operated independent of Bimbo.  It in fact bound them to make deliveries only for Bimbo, rather than for any of its competitors. Dkt. 88 at 13.

---

[26]    Indeed, Plaintiffs only buy a truck, not specialized tools required of a carpenter or welder.

[27]    <u>Bimbo Bakeries "About Us"</u>, available at https://www.bimbobakeriesusa.com/about-us#fact-sheet (accessed Jan. 15, 2020).

### C. Plaintiffs Did Not Need Specialized Skill or Initiative to Perform Their Work.

The District Court focused on Plaintiffs' use of managerial skills to perform their work for Bimbo, including by "managing their own independent profits and losses." Franze, 2019 WL 2866168 at *9.  Plaintiffs could hardly be said to exert independent "business skills" where Bimbo negotiated the prices at which Plaintiffs supposedly bought and sold Bimbo's products.  Bimbo also required Plaintiffs to service chain-store locations along their route, regardless of whether they were profitable for Plaintiffs.  Dkt. 89-12 at 7; 89-2 at 50–51.  Because of Bimbo's noncompete provision, drivers could not use their business acumen to offer competitive products which might be in higher demand than Bimbo products.  Plaintiffs' managerial skills were simply not used in a way indicating they were "in business for themselves." Brock, 830 F.2d at 1060.

### D. Bimbo and Plaintiffs' Working Relationship was Long-Term and Permanent.

The District Court found that this factor cut in favor of independent contractor status because Plaintiffs' ability to sell their Distribution routes allowed them to control "the terms and permanency of their relationships" with Bimbo.  Franze, 2019 WL 2866168 at *9–10.  First, this incorrectly focuses on "what Plaintiffs *could* have done," rather than what they did as a matter of economic reality.  Saleem, 854 F.3d at 142.  Franze worked under his distribution agreement

for nine years, Schrufer for twenty-one.  See Dkt. 88 at 12.  Such long-term service

cuts strongly in favor of employment status.[28]  Compare Scantland, 721 F.3d at

1318–19 (duration of working relationship cut in favor of employee status where

named plaintiffs worked for employer an average of more than five years.); see

also Keller v. Miri Microsystems LLC, 781 F.3d 799, 808 (6th Cir. 2015) (finding

genuine dispute of fact regarding "permanency" FLSA factor where Plaintiff

worked for Defendant for twenty months and alleged a de facto exclusive

employment relationship); Benion v. LeCom, Inc., 2016 WL 2801562 (E.D. Mich.

May 13, 2016) at *6 (Permanency of working relationship cut in favor of employee

status where Plaintiffs worked as long as a decade for Defendant.).

Second, Franze's job as a security officer does not indicate he was an

independent contractor.  Franze, 2019 WL 2866168 at *10.  As this court

recognized, "[i]t is certainly not unheard of for an individual to maintain two jobs

at the same time, and to be an 'employee' in each capacity."  Saleem, 854 F.3d at

---

[28]     The District Court also downplayed the conditions Bimbo imposed on sales
of Plaintiffs' routes, including requiring approval of all sales, maintaining a right
of first refusal, and taking a two percent cut of any such sale.  Dkt. 89-12 at 10, 15.

        Further, Plaintiffs' ability to "exit" an economic relationship is
indistinguishable from a typical employment relationship—an "employee" can
always quit their job and start working for a competitor.  This factor should
therefore not cut in favor of independent contractor status.  See Sunshine, *supra*
note 13 at 151.  Indeed, the price Plaintiffs pay for their routes would make it *more*
difficult to exit the relationship.

142, n. 24. The significant point was that the drivers, "unlike traditional employees, were free—without compromising their franchises or facing adverse consequences—to divide their time as they saw fit between [Defendant], its competitors, and personal clients." Id. Here, Plaintiffs were not free to divide their time as they saw fit without consequence—if they did not arrange coverage for their routes or otherwise meet obligations imposed by Bimbo, their agreements with Bimbo could be terminated. That is not characteristic of a worker "in business for themselves." Saleem, 854 F.3d at 139. It is instead characteristic of an employer disciplining their employee for unsatisfactory performance.

### E. Plaintiffs are an Integral Part of Bimbo's Business.

The District Court concluded that Plaintiffs were part of Bimbo's distribution chain, and so not an integral part of their business. Franze, 2019 WL 2866168 at *10. That conclusion is plainly inconsistent with the court's dismissal of all claims against BBUSA and its suggestion that Plaintiffs' contractual relationship was only with BFBD. Id. at *11. BFBD (Bimbo Food Bakeries Distribution Inc.) is at its core a distribution company. Though Plaintiffs were essential to BBUSA's business as a whole, it is especially untenable to sustain the conclusion that workers making deliveries for a distribution company are not an integral part of the company's business. As noted, Bimbo treats as employees other drivers performing the same work as Plaintiffs. Dkt. 88 at 13. BBUSA calls

those employees "the vital link between Bimbo Bakeries USA and our customers."
Dkt. 89-25 at 46.  To investors, Bimbo boasts that it has "one of the world's largest
[Direct Store Delivery] networks," which allows it to make over 1.5 million daily
store visits.[29]  As a Massachusetts court put it when analyzing whether employees
were engaged in the "usual course" of the employer's business, "[w]ithout the
services of the workers, [the employer] would cease to operate."  Rainbow
Development, LLC v. Com., Dept. of Industrial Accidents, 2005 WL 3543770 at
*3 (Mass. Super. Ct. Nov. 17, 2005).  Without the services of drivers like
Plaintiffs, Bimbo's distribution network would collapse.  It would either cease to
operate or transform into a fundamentally different business.

## V.     Saleem is Distinguishable.

The District Court's decision to grant Bimbo summary judgment relies
heavily on this court's decision in Saleem, 854 F.3d 131.  However, the drivers in
Saleem enjoyed considerably more autonomy and independence than Plaintiffs.
They could and did compete directly against their putative employer by working
for its business rivals.  Id. at 141–43.  Here, Bimbo prohibited Plaintiffs from
working for its competitors.  See Dkt. 89-12 at 7.  Indeed, Franze testified that he
could not purchase a competing Pepperidge Farms route because of his distribution

---

[29]     Investors Presentation 3Q19 at 5, BIMBO BAKERIES (Third Quarter 2019),
available at https://grupobimbo.com/en/investors.

agreement.  Dkt. 89-1 at 11–12.  The <u>Saleem</u> court noted that the noncompete

provision in the drivers' franchise agreement only prohibited them from driving

<u>Defendant's</u> customers without processing <u>those customers'</u> payments through

Defendant's system.  They were otherwise free to transport passengers for

Defendant's competitors.  <u>Saleem</u>, 854 F.3d at 136.  That would be the equivalent

of Bimbo allowing Plaintiffs to transport competitive products, which they

expressly prohibit.

Additionally, the <u>Saleem</u> court found that even when working under the

Defendant's umbrella, Plaintiff drivers "wielded considerable independence and

discretion," including by choosing when, where, and how often to work, and by

declining jobs the Defendants offered.  <u>Id.</u> at 137.  The <u>Saleem</u> Defendants did not

require drivers to give any notice about when they intended to work, "nor did they

make any effort to coordinate drivers' schedules."  <u>Id.</u> at 146.  Conversely, Bimbo

exerted de facto control over Plaintiffs' schedule by negotiating delivery windows

with their customers and enforcing that schedule with respect to Plaintiffs.  Unlike

the <u>Saleem</u> drivers, Plaintiffs were not free to stop working as they wished, even

for a family emergency. <u>See</u> Dkt. 89-1 at 26–27 (Franze testified that he received

breach letters from Bimbo when he took time off when his daughter was born

prematurely.); Dkt. 89-19 at 15 (Breach letter to Franze regarding failure to deliver

to customers.).  Far from wielding independence and discretion, Plaintiffs were

subject to Bimbo's control in almost all aspects of their work—from the prices they charged to the unprofitable stores they could not decline to service.

## VI. CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's grant of summary judgment.

Dated: January 22, 2020

Respectfully submitted,

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.                                    *Attorneys for Amici*
Harold Lichten, Esq., *request for admission pending*.
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com
hlichten@llrlaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 29.1 and 32.1(a)(4)(A) and Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that this brief contains 6,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as established by the word count of the computer program used for preparation of this brief.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 14-point size Times New Roman font.

Dated: January 22, 2020

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.
Harold Lichten, Esq., *request for admission pending*.
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com
hlichten@llrlaw.com

# CERTIFICATE OF SERVICE

I, Shannon Liss-Riordan, hereby certify that a copy of the foregoing document was filed electronically with the Clerk of Court of the United States Court of Appeals for the Second Circuit and served upon all counsel of record via the Court's CM/ECF system and that a hard copy was served by first class mail, postage prepaid, upon all attorneys of record on January 22, 2020.

Dated: January 22, 2020

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.
Harold Lichten, Esq., *request for admission pending*.
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com
hlichten@llrlaw.com